from the District Court, Indiana, Northern District of Indiana, and we'll get started with the first case, Uchimi v. Bank of America. Mr. Bernstein. Good morning, Your Honors. Good morning, Counsel. I'm Abraham Brustein. I'm arguing for two of the appellants, Petunadi Veluchamy and Parameswari Veluchamy. I'm referring to them as the senior Veluchamis. This appeal is from a final order of the District Court in a case that began as an adversary proceeding in the Bankruptcy Court. The Bankruptcy Court conducted the trial and entered proposed findings and conclusions that were submitted to the District Court conducted a de novo review pursuant to 28 U.S.C. Section 157C. The District Court entered the final judgment. Regarding the senior Veluchamis, the District Court's final judgment adopted all of the Bankruptcy Court's proposed findings and conclusions. The appeal presents issues arising from two distinct sets of facts. The $5.5 million the senior Veluchamis, the JSM spinning mill bank account from July of 2010, and the turnover order entered by the District Court with respect to 24 pieces of jewelry. Regarding the $5.5 million, there is both a procedural and a substantive issue on appeal. The procedural issue is whether the judgment is fatally flawed because it was brought as a turnover proceeding solely against the senior Veluchamis without joining JSM as a party, the party into whose bank account the money was transferred. The substantive issue is whether there was any evidence to support the conclusion that the $5.5 million was still in JSM's bank account 13 months later when the senior Veluchamis filed their bankruptcy petition. If so, there's the second issue, did the senior Veluchamis have control over the disposition of the money if in fact it was there 13 months later? The second set of issues relates to 24 pieces of jewelry. The senior Veluchamis are not contesting the finding that the jewelry is property of the estate. The issue on appeal is the proper wording of the turnover order that's set forth in paragraph 9 of the court's final judgment. The first issue is what are the standards for turnover under section 542 of the bankruptcy code? It's axiomatic that property that has been transferred cannot be the subject of a turnover proceeding. Turnover proceedings are not the mechanism to adjudicate disputed property rights. If property has been transferred prior to bankruptcy, the appropriate relief is for a trustee to avoid the transfer and recover the value of the transfer of the property from the transferee, not to seek recourse against the debtor. These bedrock principles were expressly recognized by both the bankruptcy court and the district court. If there's a transfer, there must be a fraudulent transfer case brought against the transferee. However, the bankruptcy court and the district court both misapplied the appropriate legal standards. The first issue that had to be addressed by the trial courts was, was the $5.5 million transfer. When the senior Veluchamis caused the $5.5 million to be wired into JSM's account, JSM obtained sufficient rights in the transfer funds to be considered a transferee. Under the common law of the various states in the U.S.A., there's a rebuttable presumption that the owner of a bank account, as shown on the bank's records, has the right to control the use of the funds in its account. Indian law appears to be the same. Yet the estate representative did not introduce any evidence to rebut this evidentiary presumption. Well, I assume the presumption is what? That JSM is completely unconnected to the senior Veluchamis? No, Your Honor, the evidentiary presumption is that JSM, as the owner of its own bank account, has the right to control the use of the funds in its bank account. And that has nothing to do with whether there's a connection between the senior Veluchamis. It doesn't matter whether or not they control JSM. If JSM, I believe that's correct. It doesn't always control JSM for that particular point. To get the money. Correct. And to dispense the money. It can't go anywhere else without the senior V's. There is no evidence to support that final proposition that Your Honor just stated. The owner of the bank account gets the benefit of that rebuttable presumption. JSM, which is in India. It is in India. But there's no reason why an action can't be brought against a foreign national, a foreign entity. Well, a lot of reasons, but it's very difficult. That's beside the point. Really, I think that we understand that this is where, that's where the money is or was. So there's five and a half million dollars, and that seems to be a major issue in this case, whether it's out of reach of this bankruptcy. I think the major issue in the case for this particular point, Your Honor, is whether the 5.5 million dollars was still there 13 months later. I think that is the crux of the issue. They said it is not, I presume. Correct, but it was the estate's burden to show that it was. Both the Bankruptcy Court and District Court properly looked to Bonded Financial and USA Diversified as controlling circuit precedent on the issue of transfer, but then it misapplied the standards of those cases. Bonded Financial instructs that a party is a transferee if it has the right to put the money to its own purposes. USA Diversified amplifies the reasoning of Bonded Financial, but it does not alter the underlying rule when it states that a transferee claims an entitlement to the property transferred. JSM had full right to use and control the money in its own bank account. That's a natural consequence of the rebuttable presumption. In USA Diversified, this Court, does it matter who controls JSM for that presumption to apply? Who controls JSM, Your Honor, may be relevant on whether the presumption is rebutted, but the presumption applies. This Court in USA Diversified characterized the contrary argument that an owner of account does not have the right to control its use as bordering on frivolous. The District Court erred when it looked to USA Diversified and said that title to the money. The correct interpretation is a claim of entitlement to the money, and certainly JSM had that. Significant evidence corroborates the rebuttable presumption. JSM is not a shell company. It's not a trust. It's not a self-contained receptacle for use by the Velichamis. It's an operating company. It's been in business for years. It obtains working capital with loans from Canara Bank. It submits corporate regulatory filings under the Indian Companies Act of 1956. It is a viable going concern. It uses its bank accounts. This is a critical distinction that distinguishes this case from In re Lawrence and Dexia. So if JSM is a transferee, or if it even appears on its face that it's a transferee, the trustee could have done two things. It could have sued JSM, albeit difficult, but I don't know that the difficulty is the determining factor. It could have sought alternative claims for a conveyance case against JSM, and alternatively sued for turnover with respect to both JSM and the senior Velichamis, and used that as a vehicle to adjudicate the property rights. But that's not what it did. Your Honor, even if there was no transfer, and this case could proceed as a turnover, the turnover judgment against the Velichamis must be reversed because simply there was no evidence that the money was still on deposit 13 months later. The trustee has the burden of proof on all issues in the turnover case. The first element is the property must be there. There was no evidence that the money was still there 13 months later. If the money wasn't there, you don't reach the issue of control. There's no turnover action. Velichamis had no obligation to present evidence as to what became of the $5.5 million. That was the estate's burden of proof. The fact that the courts did not accept any of Mr. Velichamis' testimony does not alter the evidentiary void. Whether his testimony is given credit or not as to the reason why he made the transfer doesn't affect whether or not the money was there 13 months later, and there was no evidence to suggest there was. The estate's evidence, its primary evidence was its expert report, and the expert report looked to the fact that JSM didn't report the $5.5 million as share capital or shareholder loan, but that doesn't go to the issue of whether the money was there. The money was actually received by JSM in July of 2010, and there was no direct or indirect evidence as to what became of it 13 months later. The expert didn't go on to conclude that the money was there. The expert only concluded that there was no consideration for the money, and the money had not been returned to the Velichamis. The conclusion reached by the trial court and the bankruptcy court went well beyond what the expert opined. Where did the expert say it went? The expert didn't say anything about where it went. You said it hadn't been returned. It had not been returned. From whom? From JSM. In other words, there was no evidence that money went to the Velichamis, that $5.5 million. Was there evidence it went to JSM? Absolutely. That's an admitted uncontroverted fact in this case. Okay, so from what we know, it's either at JSM or it's correct, and there's nothing to the contrary. The fact that the financial statement doesn't show an increase in stated capital or an increase in shareholder loan doesn't really go to the issue of where did the money go? Was it used? And the natural presumption is an operating business uses the money in its bank account, and it wasn't the senior Velichamis' obligation to present evidence on that point. The estate representative makes a parking statement. Parking lot argument. That JSM was the parking lot for the senior Velichamis' funds. But that should be rejected. Funds in JSM's account were clearly exposed to Canara Bank's rights of set-off in the event of a loan default. They were clearly available for use by JSM as operating capital to conduct its business, and they were clearly available to satisfy creditor claims. So there's nothing to support the parking lot theory, and it doesn't make sense. The senior Velichamis clearly were guarantors of the loans to Canara Bank, and putting $5.5 billion in a company whose debts they had guaranteed makes all the sense in the world. So rejecting the senior Velichamis' obligation to present evidence on the reasons for why they did it doesn't affect the ultimate issue. And if the money wasn't there, the level of control doesn't support a turnover action. The estate just failed to establish that the money was there. I want to quickly go to the jewelry issue. The jewelry issue, the only question is, what is the proper wording of the order, the remedial order? The proper wording is what the bankruptcy court put in footnote 28. Remember, when the case started, there were two pieces of jewelry and a fund of cash funded by exempt assets sitting in the district court's registry. After the court determined that jewelry was property of the estate, the proper order, which was articulated by the bankruptcy court, was you turn over the jewelry. If the jewelry is not available, the judgment will be satisfied in cash, and the money in the district court registry can be used for that purpose. But when the order came out or came down from the district court, it could be read to mean that you must turn over either all 24 pieces of jewelry or cash equal to the value of the 24 pieces, but not a combination. And that's clearly not what was intended, and given the fact that there was both cash and jewelry on deposit, that is not the order that should be entered. It should be... What was the value? The value was about $1.3 million. For all the pieces of jewelry? It was in that range, correct. It's stated in the opinion. And there was a cash deposit of $700,000 or $800,000 in two pieces of jewelry. I see my time is up. Thank you, counsel. Mr. Senate? May it please the court. Your Honor, before filing for bankruptcy, a debtor takes 10 shares and gives it to a transferee, and the Chapter 7 trustee attempts to apply it back, and it's pretty clear that the value, the recovery of the Chapter 7 trustee would be the value of the shares which were given. If, however, the debtor dilutes his own corporate interest in the entity, and because of that dilution, transferees receive some of the ownership percentage which the debtor used to have, but now the debtor has a reduced ownership percentage, then it's pretty clear that the Chapter 7 trustee can either avoid the transaction and get the same percentage which the debtor used to have, or get the transferees to pay back the value. Do you represent the kids? Yes, Judge. And that was the mistake made by the bankruptcy judge, because Judge Weedoff valued the shares which were received by Arun and Anu Velichamy. He evaluated those shares. He didn't evaluate the loss which the estate had by losing the shares in V-Mark. The estate had a 70% interest in V-Mark, and Arun and Anu had a 30% interest. Following that, there was dilution of the ownership interest. In August and September, there were two transactions, because of which V-Mark issued additional shares. As a result, the estate's ownership interest went from 70% to 48%, and Arun and Anu's ownership interest increased. Now if the trustee attempts to apply it back, the focus should be on what the estate lost. There's not a lot of case law on dilution of shares and avoid and recovery by the Chapter 7 trustee, but the limited case law which is on there, Inderaj Riling, which is a bankruptcy case from Colorado, states that, that the focus should be on what the estate lost. In that case, there was a restructuring of a car dealership, which reduced the ownership interest from the debtor from 75% to 43%. And the bankruptcy court ruled, we're going to cancel and negate that restructuring and get the estate back to 75%. How is that impacted by the bankruptcy court's finding that the value given for that stock was not in good faith? How does that finding affect the rules you're talking about? So Arun and Anu paid $5 million to get this additional catch, which V-Mark issued. The money given by Arun and Anu cannot be taken into account when calculating damages because 546C precludes any amount given by the transferee if it's not in good faith. The dilution is not covered by 546E because before any of the transfers happened, Arun and Anu already owned 30% of the V-Mark shares. The additional dilution which happened, they didn't give any money to the estate besides for the $5 million, which was not calculated. It was an issuance of additional shares from V-Mark. Because of that, their ownership interest went up, and because of that, the estate's ownership interest went down. What was the value of the company originally? The value of the company is undisputed. It's $57 million. There's no dispute about what Judge Wieland said. That's a present value? Or more or less present? I don't know what that is. V-Mark was sold in the Qualcomm bankruptcy cases for less than $57 million, but at the time the transactions happened, Judge Wiedok valued it after considering expert opinions at $57 million. So there's no valuation on what 100% of the company is worth. Now we know the percentage ownership of the estate dropped from 70% to 48.4%, and that's a simple math calculation. And the bankruptcy court did not do that calculation. Instead, it focused on shares received by the transferee, and that was a mistake committed by the lower court. Next, Judge, your honors, there's no provision in the bankruptcy court which provides for accessory liability theories of recovery. All recovery by the trustee, either under Section 544, 547, 548, whatever the avoidance section may be, Section 550 is the remedies provision, and that controls. And Congress has decided how that is going to be applied. The trustee can recover from the initial transferee or from subsequent transferees. And there are some defenses available to subsequent transferees which are not available to initial transferees. The trustee under the bankruptcy court has no right to assert a civil conspiracy and aiding and abetting action and recover under that. Those are state law causes of action. They don't arise under Section 548. They might arise under Section 544, but even if you obtain an avoidance action under 544, recoveries are still governed by Section 550. Section 550 is clear. There can only be recovery from the initial transferee or the subsequent transferee, and there's no support for a civil conspiracy or aiding and abetting in the bankruptcy court. Well, what are the subsequent transferees? Besides, the first transferees are basically the kids, right? Correct, Judge. Okay, so what's a subsequent transferee? Whoever it may be, if Arun and Anu transferred it to somebody else, or if there was an entity which the senior village homies transferred any amount of money to, which then transferred it to Arun and Anu, then Arun and Anu could be liable as subsequent transferees, or if they directly got it, they could be liable under initial transferees. What the bankruptcy court did was make an explicit finding that Arun owes $28 million for fraudulent transfers received by him, and Anu owns $29 million for fraudulent transfers received by her. Then the bankruptcy court made a finding that under civil conspiracy and aiding and abetting theories, they're both liable jointly and severally for any amount which is received. And that just simply has no, there's no support for that in Section 550, and even before Section 550 was enacted, if you look at precode case law, if you look at the decision in Mack v. Newton in Fifth Circuit, it explicitly states even if the alleged transferee conspired with the debtor, even if there is evidence of conspiracy, the bankruptcy act at that time simply does not allow recovery for civil conspiracy and aiding and abetting. There's a Ninth Circuit case law. The problem is obviously, you know, this is, before all of this started, they were supposedly worth a half a billion dollars, and the, I guess the parents, and then with all this disbursement, it's scattered in so many directions, it's truly hard. I think it was Ross Perot used to say, follow the money, and this is pretty hard to follow. And that's the problem with this case, and I think that seems to be what the district court and the bankruptcy court concluded, that this whole diffusion is going to have to be cobbled back together, because that's the whole effort, seems to have been, to put the money in all so many places to be hard to find. You're not questioning the avoidance action. We're not questioning what happened was fraudulent or not, whether or not avoidance should have happened. Okay. It's only the statutory remedy provided by Congress for recovery, and that is limited. It does not provide the Chapter 7 trustee with carte blanche to get money from anybody else besides the transferees. There have to be the procedures followed, and the bankruptcy judge is limited by Section 550. And that was also the pre-code practice. There's a Ninth Circuit decision in Elliott v. Wushan, which simply states that the legislative theory is cancellation, not creation of liability. There's other decisions after 1978, when the there's a bankruptcy district of Delaware case, which says that Congress has provided the remedy for any avoidance, and that is Section 550. That was a case, similar pattern, Chapter 7 trustee asserted aiding and abetting and civil conspiracy actions against people who received property or allegedly helped in distributing the property to debtor, and the Delaware court said, no, the Chapter 7 trustee cannot recover under civil conspiracy actions. And even if the Chapter 7 trustee can bring a claim under civil conspiracy aiding and abetting under Illinois law, which in this case did not happen, when it was merely a Section 548 bankruptcy code fraudulent conveyance action, there's a lot of dispute whether the Uniform Fraudulent Transfer Act, or UFTA, provides a remedy of conspiracy aiding and abetting, these accessory liability theories of recoveries, from people who did not get the property, but from, but who engaged in people who did not what? From non-transferees, Judge. When the transferor makes the transfer to the transferee, if there's an accountant, or there's a lawyer, if there's other people involved in disbursement of that property, then there's case law which states that the UFTA does not support a civil conspiracy aiding and abetting action. There's a case which was submitted, which was filed in Ray Glick by Judge Goldgaard after the briefs were filed, which looks into a bankruptcy case filed by the appellees in Ray Resource Development, and state that case was incorrect, and the UFTA does not provide for any sort of accessory liability recovery. Resource Development was a bankruptcy court case in this district, which stated there could potentially be an action under Section 8 and 11 of the UFTA, but a later decision in Ray Glick simply states that in Ray Resource Development was wrong. It cites an Arizona case which collects case law from multiple jurisdictions saying because the UFTA provides equitable remedies, these tort actions for I want to address the issue of waiver, which was raised by the appellees, that we haven't raised the objections to civil conspiracy aiding and abetting. We've raised objections that the court should not have found so, but we haven't raised in the lower court that the court could not have found so. To that, I submit that we did object to the conspiracy aiding and abetting findings in both the post-trial brief and the objections to the proposed findings affecting conclusions of law. The governing point is Section 550, Your Honors. That's the only provision which controls. Lastly, I want to cover the Upwood Hotel stocks. The bankruptcy court issued judgment on that for $310,000. The district court increased the judgment on appeal from the appellees for an additional $1.26 million. There was simply no evidence. The bankruptcy court did not enter judgment on that, even though it entered judgment against Arun and Anu on a plethora of counts. It found that there was no evidence connecting the additional $1.2 million. That comes from a subscription agreement from Upwood Hotels, which is an Indian company, which stated the following people received shares after a share issuance. On it were Arun and Anu, who received a certain amount of shares, and then the estate tried to trace the money from the Velachamis and from Arun and Anu to see where the money came from. It traced the $310,000 for which the bankruptcy court entered judgment, but did not trace an additional $1.2 million. The burden of proof is on the estate to prove a fraudulent conveyance, and that burden was not satisfied. It was errored by the district court to reverse the bankruptcy court on that point. Good morning. My name is Howard Rowan, and I represent the Bank of America as a state attorney. I am here today with four members of the Velachami family to hide more than $60 million from the Velachami's creditors. The defendants don't challenge the findings that they worked together to perpetrate this fraudulent scheme. Instead, the appeal is limited to trying to reduce damages, but the bankruptcy court and the district court got it right, and this court should affirm. Before addressing the defendants' arguments specifically, I want to make a few general points. The first one is, in their briefs, the defendants urge you not to be distracted by supposedly irrelevant character assassination. We have not assassinated their character. The findings of the courts below did that, and those findings about their character is relevant because under both bankruptcy law and fraudulent transfer law, intent and bad intent is relevant. The second point that I'd like to make is that throughout the appeal, the defendants essentially ask you to reward them for the clever way in which they conducted their fraudulent scheme. For example, they admit they sent $5.5 million to a bank account in India in the name of a company they controlled, but they claim nothing can be done about it because it's overseas and it's hard to find evidence from there. That's exactly why this court five years ago affirmed the Belashami's passports to be taken so they would be in the United States and they would be subject to court orders, even if the property was secreted overseas. Another example where the Belashami's want to be rewarded is they claim they should benefit because instead of giving the V-Mark stock to their children, the four of them got together and caused V-Mark to issue new stock to their children. As we showed in our briefs, the defendants' arguments are legally wrong. The law does not give special dispensation to clever fraudulent schemes, and it would be hard to imagine a worse precedent than to allow the defendants to evade their liability because of the clever way in which they conducted their affairs. The third point I'd like to make concerns the alleged lack of evidence. The defendants are wrong about that. The record is overwhelming supporting the findings of the bankruptcy court and the district court, but that's no thanks to the defendants and lied under oath. And on top of that, Arun and Anu took the fifth on everything and their parents took the fifth when it suited them. The law does not and should not reward litigants who hide, fabricate, and destroy evidence and then take the fifth. Let me start. Let me just follow up on that with a question. Understanding that you can draw negative inferences from all those things, is there other evidence besides the negative inferences that the 5.5 million was still there or that there was the 1.26 million in addition to what the bankruptcy court said? The answer is there absolutely is a lot of evidence on the 5.5 million, and let me just review that, Your Honor, because I think that's a good question. The first thing with respect to the 5.5 million is the Velashamis never denied, never denied that all the money, and Arun and Anu never denied that all of the money came from the Velashamis. They didn't do it in the trial court. What they said in the trial court was 670, was the, I'm sorry, what they said in the trial court was, you know, it's far away, but they didn't deny that the money was in the account. With respect to the 5.5 million... They referred to that as being in a parking lot. So we just, you can just go from there. The bankruptcy court and the district court correctly found the money was parked in that account. The question is whether it was still controlled by the Velashamis. The bankruptcy court found that it was controlled by the Velashamis and the district court agreed, and the evidence, not just the adverse inference, but the evidence confirmed that. What was the evidence? For one, we saw that the Velashamis were able, during the case, to move money in and out of the spinning mill accounts. The second thing is during the case, the Velashamis were able to cause JSM to issue phony reports about who owned the company. The Velashamis controlled that. So you have the Fifth Amendment, but more important than that, you have really overwhelming evidence that the Velashamis controlled this money. Were they refused the answer of where it is and how much? The Velashamis, so they sent the 5.5 million dollars to India and we found it. And then after that they didn't dispute it. What they did is they refused to produce any more documents showing what happened to the money. And there's a description of that in the district court's opinion about how they were asked to produce documents and Mr. Velashami refused. He said it would be a waste of his time. We did everything we could in light of the money being parked overseas in India. We showed that it went there and that was undisputed. And then we showed that the Velashamis continued to control it and the Velashamis refused to produce evidence about where the money went. Instead, they repeatedly lied. First they said they didn't control the company, but that turned out to be based on forged documents. Then they said the money was used to give them stock, but they had to admit they didn't get any stock so they dropped that. Then they said the money was used to pay a loan, but later they admitted okay it wasn't used to pay a loan. And now what you heard from counsel today is well okay the money, the 5.5 million, went into the account in mid-2010, but how do we know it wasn't spent? And the answer is we've shown everything we can show in light of the limits of the money being parked in India by showing that it went into the account. And then the Velashamis, they had it within their power to show where the money went. They controlled those records. They controlled that company, but they refused to do it. Instead, they had these four lies that were all found to be lies. If the money really had been spent sometime between July 2010 and August 2011 when they filed for bankruptcy, that would have been the first thing the Velashamis said. It wouldn't have been the fifth thing that they asserted after the first four things they said were proven to be lies based on forged documents and the like. Spent would obviously mean it went into some other entities and they don't control. They would have to show that. I know, but I guess that's what spent means. I think that's what it means and there is zero evidence of that. And is it more probably true than not? In fact, I think it is beyond a reasonable doubt that if the money was no longer in control, they would have been able to show that in a second. And what they want you to do is they want you to reward them for having the foresight to send $5.5 billion to India where it's hard to get a hold of them. And by the way, one of their arguments with respect to the $5.5 million is that JSM needs to be included in the case, Rule 19. But JSM isn't subject to service of process. JSM hasn't expressed any claim on the money. And in this court's precedent, the Dexia case is the best example, you don't worry about the place where they parked the money if the court correctly found that the money is controlled by the Belashami's. And I submit there is overwhelming evidence that the money is controlled by the Belashami's. Now let me go back to Arun and Anu and I want to talk about the item that's the biggest money that Arun and Anu raise, and that's this joint and several liability. The first thing I have to say about that is they waived that. They did not raise this argument. They made some arguments in the bankruptcy court and the district court, but they were different arguments, we've set them out in our brief, and they were rejected correctly and they don't pursue them here. They waived it. And the rule in the Seventh Circuit, like everywhere else, is if you waive an argument, it's gone. You can't raise a new argument on appeal. The Belashami's, excuse me, Arun and Anu have cited this court's Hunsinger case for the proposition there might be a narrow exception where you can pursue a waived argument on appeal and that's limited to jurisdictional reasons. Arun and Anu said in their brief that the exceptional circumstances is that they have a good argument. But there's no civil case where waiver was ever found to be negated based on that ground. Even the Hunsinger case that Arun and Anu cite held that the argument was waived. The bottom line is that Arun and Anu's joint and several argument was not made in the bankruptcy court. It was not made in the district court. So it's doubly waived. They don't get to make it here. And let me say one other thing. The test in Hunsinger is exceptional circumstances where justice requires. I submit to you that justice does not require relieving Arun and Anu of joint and several liability when it is uncontested that Arun and Anu jointly participated in the scheme to hide all of this money and much of it went into their hands. Even if their joint and several argument was not waived, it's wrong. The main argument you heard from counsel this morning and you see it in the briefs is that under section 550 of the bankruptcy code only a transferee or subsequent transferee is liable and that means that Arun and Anu are only liable for the money that actually went into their hands and therefore you can't have joint and several liability. The problem with that argument is Arun and Anu's counsel left out the third prong of section 550. And I have it here. The third prong, I mean there's liability under 550 for initial transferees, for subsequent transferees. The third prong is for the entity for whose benefit such a transfer is made. And in this case the entity for whom the transfer was made that got the benefit was the Velashamy family and that's why they should be held liable for joint and subsequent transferees. Now Arun and Anu said in their brief, they didn't mention it here, but they said in their brief that under section 550 if you're a transferee you can't also be liable as a beneficiary because the word or is in the statute. But that's contrary to the scheme of the code and the text of the bankruptcy code which says in section 102 clause 5 that when the word or is used it's not exclusive. You can have both. In this case Arun and Anu are liable as transferees because they got money directly. They're liable as subsequent transferees because sometimes they got money secondarily, sometimes from each other, and they're liable as intended beneficiaries. And the way the code makes sure there's no double counting is by applying something called the single satisfaction rule. Arun and Anu argue in their brief that a family can't be a beneficiary under section 550, but this court held otherwise. In the Boyer case, which we cited, this court held that the debtor's family, the wife and children, were liable not because they were transferees, but because they were beneficiaries. Because the whole point of the transfer was to keep the assets, and I quote, out of their creditors hands and devote them to the family's benefit, unquote. The Velashami family could be a beneficiary. And here the purpose of fraudulent transfers and the intended beneficiaries are identical to the purpose and intended beneficiaries in Boyer, to keep the money out of the hands of creditors and in the hands of the family. Arun and Anu benefited here not just because of the money they individually got, the property and stock they individually got, but they benefited because the money was kept away from creditors and in the family. And the bankruptcy code specifically imposes liability on intended beneficiaries, and that's why the bankruptcy court and the district court were right to impose joint and several liability on Arun and Anu. By the way, there's a difference, one difference, important difference, between the facts here and the facts in the Boyer case. In Boyer, the court held that the mother was liable for the entire amount transferred, but the minor children were not because they were innocent. But here we have a different situation. Is it due to their minority? The fact that they were young? Well, that of course is part of it. They just weren't involved. I mean, they were young and they didn't participate in the scheme. And here we have the opposite. Arun and Anu are adults. They have been found to have limitation on liability for people who didn't participate. The flip side is true here. The cases Arun and Anu cite, and they mentioned in the argument, they mentioned the Elliott case and the Mack case. They don't support their argument because those cases dealt with defendants that didn't receive any of the transferred money, and they were not intended beneficiaries. And here, of course, we have the opposite. Arun and Anu received millions of dollars, and they were intended beneficiaries. In addition, we've cited in our briefs, and we haven't heard about this today, under the Jackson case in the Eighth Circuit, another reason for joint and several liability is when the money has been commingled. And here, Arun got money and gave it to Anu, and Anu got money and gave it to Arun. Some of the money went into Oak Brook Financial that they both were involved with. It's true that our expert did its best to trace all this money, but what the Jackson case says, and it seems right to me, is when people are involved in a scheme and they commingle everything, joint and several liability is appropriate, and you can let the conspirators deal with the problems of who pays what later. In addition to Section 550, there's a second basis for joint and several liability under the Code, and that's Section 544A. Aruna News Council talked a lot about Section 544B. I want to focus on Section 544A, which is known as the Strongarm Clause, and it authorizes a bankruptcy trustee to exercise all of the rights and powers that a judicial creditor would have. The courts and appeals around the country, including in this circuit in the Vistria Steel case, have established that in Section 544A authorizes a bankruptcy trustee to bring state law claims. And in Illinois, and we've cited these in our brief, in Illinois those state law claims include aiding and abetting and conspiracy when you have a fraudulent transfer. Now in their reply brief, Aruna News cite a case called Greed, G-R-E-D-E, which this court decided and they say that it limits Section 544A, but that's not true. 544A did not in any way limit, excuse me, Greed did not in any way limit what 544A allows the trustee to do. It expanded it. What Greed said was in addition to bringing the estate's claims, the trustee also could bring assigned claims, claims that were assigned to it. Aruna News say that that only applies to a post-bankruptcy liquidation trustee, but there's no basis for that. 544A applies to the estate as well, there's just no support for their basis for affirming here the waiver. And that's because Bank of America was the largest creditor and became the estate representative. If the estate knew that joint and several liability was being challenged as a legal matter and therefore we needed to get assigned claims, it would have been very easy for Bank of America to take its claim and assign it to the trustee. We didn't do that because the issue hadn't been raised. And if this court allows the defendants to raise this waived argument, we're prejudiced. Last point on joint and several liability, Aruna News say that Illinois law does not allow joint and several liability for fraudulent transfer cases because it doesn't allow anything at a betting or conspiracy. They base that argument on cases from Florida and Nevada. But they have a problem because there are a lot of cases decided under Illinois law that hold the opposite. And what Aruna News say in there, and we've cited those starting at page 29 of our brief, what Aruna News say in their reply brief is those cases that we cited don't count because they were decided on a motion to dismiss. That argument answers itself. If you can state to defeat a motion to dismiss an aiding and abetting or a conspiracy claim, then, you know, obviously, where you have a situation where the aiding and abetting and conspiracy are proven, and at this point it's uncontested, they were proven, then they state a good claim then, too. So the bottom line with respect to the holding with respect to joint and several is all the elements for joint and several liability have been proven. The other side's arguments are waived and they're incorrect. Imposition of joint and several liability on Aruna News is appropriate under the Bankruptcy Code and under Illinois law and should be affirmed. The other big argument Aruna News make concerns the calculation of the VMARC damages. And what Aruna News say is you should focus not on the value of the stock that was transferred, but instead on what they calculate to be the dilution. Initially, Aruna News said that the test here should be done under a de novo standard. In their reply brief, they admitted the standard review is clear error. We think it's abuse of discretion, but there isn't much difference between clear error and abuse of discretion and under any standard. De novo, clear error, abuse of discretion. The Bankruptcy Court and the District Court, return of the property transferred, or the value of the property. It's uncontested that the judgment was the value of the property, the stock that Aruna News received. They got $9.3 million worth of stock each and that was the judgment. And that alone is a sufficient basis to affirm what the Bankruptcy Court and the District Court did. The second problem with Aruna News theory is that their theory about 21% dilution ignores the fact that Mrs. Velashami did not just give up some stock. She gave up and Aruna News got control of VMARC. It wasn't just some stock, it was control. And Aruna News' new calculation completely ignores the control premium, which is recognized throughout the jurisprudence in this circuit and every circuit. Aruna News expert at the trial admitted that a Aruna News got, let's look at Mrs. Velashami. Mrs. Velashami, her ownership went, I believe, from 70% to 19% of the voting stock. And that control went to Aruna News. So this dilution calculation that Aruna News want, it can't substitute for what the statute requires, which is the value of the stock they received, which is what the District Court did. And then I want to make one final point and I believe Judge Miller averted to this in his questioning. Aruna News' calculation, what they really want is they want to get credit for what they paid and the Bankruptcy Court doesn't allow that. The Velashamis, Aruna News organized this dilution scheme so they could acquire VMARC, control of VMARC for peanuts. What happened when they did that is Aruna News paid a small amount of money and the stock they held was diluted. What they paid was a combination of $5 million and dilution. If Aruna News had been innocent, they would have gotten credit for the $5 million and the dilution. But the Bankruptcy Court is completely right that Aruna News don't get credit for it because they're not innocent. They perpetrated the fraud. So they don't get credit for what they paid, whether it's the $5 million or the dilution of their shares. Let me talk for a second about the $1.25 million. What happened is one of the largest frauds in the case concerned Apu Hotels, which is a company the Velashamis don't control. The Velashamis gave $3 million worth of stock to Aruna News. There's a judgment for that and that's not appealed. And then $2.25 million showed up in Apu Hotels and Aruna News got that stock. So the question is where did that $2.25 million come from? We were able to trace $1 million of it and we showed and the court found that that $1 million came from the Velashamis. Some of it came directly from the Velashamis to Apu Hotels. Some of it went to Aruna News and then to Apu Hotels. And then there's this $1.25 million and we couldn't trace it. But it's not true that there's no evidence. There's a ton of evidence. And what's the evidence? Aruna News took the fifth, so there's an adverse inference. Aruna News clearly have the ability to say where that money came from. The Velashamis, their co-conspirators, have the ability to say where the money came from and they refused to do it. In addition to that, what Aruna News say instead, they say well $672,000 of the $2.25 million is already recovered under Count 1. Okay, so what we have is evidence of a Velashami conspiracy concerning Apu Hotels. Aruna News, none of the Velashamis deny that the Velashamis are responsible for the entire $2.25 million. Aruna News' only argument with respect to any of it is to carve off the $672,000 and by the way Judge Weedoff and the District Court agreed with that. So you have the Fifth Amendment, the conspiracy. It is, I would say clearly more probably true than not, but I would say beyond a reasonable doubt. Of course the money came from Mom and Dad. And by the way, the Bankruptcy Court didn't find we hadn't proven our case. Look at the opinion. The Bankruptcy Court just missed it. It was a very long opinion, 55 single space pages, and he just missed it. The District Court fixed it, which is what they should have done. Let me get now to the last point, and the last point is the Velashamis' jewelry. I submit, Your Honor, it was not good salesmanship for the Velashamis to raise their jewelry. The Bankruptcy Court found, the District Court confirmed that the Velashamis repeatedly lied about whether they had their jewelry, and the court found that they still controlled it and ordered them to turn it over. There's nothing wrong, nothing wrong with the court order. The court order says return the jewelry. What Arunanu, excuse me, what the Velashamis are really worried about, what they're really worried about is that they won't be believed when they say for the fifth different time we don't have the jewelry. That's their problem. It's not a basis for setting aside the judgment below. The bottom line here is the Bankruptcy Court got it right. The District Court got it right. There's no miscarriage of justice. It would be a miscarriage of justice if the court were to allow the defendants to take advantage of their scheme to try to defeat what the courts below found. I would like to ask one question on the bottom line, just mostly curiosity. How much money has been recovered? Because at one point the bank was owed $43 million. Your Honor, that's a complicated question. The bank was owed $43 million plus. That was folded into the bankruptcy estate. The Velashamis V-Mark Company was sold for $50 million. This is a bankruptcy. A lot of that money got peeled off into estates and council and things like that. The Velashamis have paid and Arunanu have paid themselves very little. Some of the money has been peeled off. I'm not up to date on exactly what we have, but there is a lot left to recover. Thank you very much. Thank you, counsel. Two minutes. Your Honor, let me first get to the point which was raised by counsel of the three parts of Section 550, initial transfer, subsequent transfer, or for the person or entity for whose benefit the transfer was made. That provision has been looked into courts when a debt is paid which pays off a guarantor's debt. For example, if there's a company in bankruptcy and there's a personal guarantor who has guaranteed a debt to a bank, and if the company pays the bank's debt, then under Section 550, then the recovery could be made from the guarantor as well because he is the person who received the benefit of that cancellation of debt. Under the family theory, which is espoused by counsel, not only can you recover from the guarantor, you can recover from the guarantor's wife, you can recover from the guarantor's sons, you can recover from the guarantor's uncles. I don't know where that ends, but the point is that that exception is a narrow exception which comes into play when you pay off a debt which is guaranteed or when you ask the corporation to pay off another creditor who an insider owes a debt to. This family enterprise theory does not have strong traction in any of the courts. The case which was cited by counsel, Boyer, the husband and wife had a company and they also had minor children for which they had UTMA accounts, and the wife was the title holder of the UTMA accounts. She got the money and then transferred it back to the companies. That was a factual pattern. In this case— She had title to the money. She was the custodian of the UTMA accounts for the minor children. Well, I mean, if you're in a joint bank account with your child, you control it. Correct, Judge. In this case, however, the leap is much more than simply going from the husband and wife who already had shares in the corporation to other family members who were not involved. Secondly, Judge, on the waiver point, there have been cases. There's the First Circuit case, Robinson v. Watts Detective Agency, cited in our brief in which Section 550 was not even raised by appellants. It was not raised in the lower court or the appellate court, but the appellate court, sua sponte, reversed, finding that aiding and abetting and civil conspiracy under Section 550 are such egregious errors that we're not going to impose liability on the people. That's the First Circuit case from 1982, Robinson v. Watts Detective Agency. Your time has expired, counsel. Just wrap it up. The last point I was going to make, Judge, was there was a concession made that Upwood Hotels was one of the entities which was not controlled by the Valachamis. That's a separate entity, and they admitted that they could not trace the funds from which they received the shares. And the bankruptcy court did make a finding on that particular account stating $310,000 is recoverable. The rest, the state has failed to sustain its burden to get it. There was no motion to amend the judgment saying, hey, bankruptcy court, you missed this particular $1.2 million. That was simply appealed, and the district court's reversal of the bankruptcy court weighed the evidence, who took the negative inference from the Fifth Amendment and the other evidence, and did not enter judgment for that account into account when he only entered judgment for $310,000. Thank you. Thank you. Thanks to all counsel. The case will be taken under advisement.